**In re Grand Jury Subpoena Served Upon Simon HOROWITZ.**

**No. 943, Docket 73–1570.**

United States Court of Appeals, Second Circuit.

Argued May 1, 1973.

Decided June 8, 1973.

Certiorari Denied Oct. 9, 1973. See 94 S.Ct. 64.

---

Martin D. Minsker, Washington, D. C. (Herbert J. Miller, Jr., Miller, Cassidy, Larrocca & Lewin, Washington, D. C., and Michael A. Lacher, New York City, of counsel), for appellants, Alexander and Elizabeth Kasser.

John W. Nields, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., of counsel), for appellee.

Before FRIENDLY and HAYS, Circuit Judges, and JAMESON,* District Judge.

FRIENDLY, Circuit Judge:

Attorneys for Alexander and Elizabeth Kasser [1] appeal from an order of the District Court for the Southern District of New York which refused, save in certain respects hereafter indicated, to quash a *subpoena duces tecum* requiring the Kassers' accountant, Simon Horowitz, to produce before a federal grand jury "the contents of all three file cabinets at 248 Lorraine Avenue, Upper Montclair, N.J., Office No. 4."

Although the record is exceedingly meagre, the factual background seems to be substantially as follows:

The case springs from a plan of the Manitoba Development Fund (MDF) to

---

* Of the District Court for Montana, sitting by designation.

1. We put the matter thus because the Kassers are in some place, presumably in Europe, unknown to their attorneys. However, the attorneys apparently have means for communicating with the Kassers and the Government has not disputed their authority to act on the Kassers' behalf.

encourage the building of a huge complex, including sawmills, pulp mills and paper mills, at an area in northern Manitoba known as The Pas, in order to make commercial use of its undeveloped forests. Early in 1966, MDF entered into an agreement with Alexander Kasser and others, acting under the name of Churchill Forest Industries, Ltd. (CFI), representing an assortment of Canadian and foreign enterprises, to construct this complex with MDF financing. When construction fell behind and a $1,500,000 interest payment was defaulted, a Canadian court, on the request of the Manitoban Government, appointed a receiver to complete the project, and the Royal Canadian Mounted Police began an investigation to determine whether any of the funds loaned by MDF had been misapplied. Allegedly the investigation developed evidence that sums up to $20,000,000 had been diverted into the hands of various corporations, including Canequip Exports Ltd., a Canadian corporation, and of Kasser and other individuals. After seizure of Canequip's records in Montreal pursuant to a search warrant on July 14, 1971, some $220,000 was allegedly drawn from Canequip's bank account with the Royal Bank of Canada in Montreal, deposited to Canequip's account in a bank in New York City and later wired to an account in Switzerland. A grand jury in the Southern District of New York is investigating whether this transaction and others violated United States criminal laws, particularly 18 U.S.C. § 2314, which prohibits the interstate or foreign transportation of funds obtained through fraud.

Among the many Kasser corporations involved in The Pas project was one known as Technopulp, Inc., having its offices in northern New Jersey. Shortly after the seizure of Canequip's records in Montreal, Kasser, who was about to sell his house in New Jersey and leave for parts unknown, communicated with his New York City accountant, Simon Horowitz, and directed that, in order to avoid a seizure of corporate and personal records at the offices of Technopulp, these should be removed. These records, contained in three locked filing cabinets, were first deposited in the New Jersey home of Kasser's son, Michael, and then moved into a room at an office building at 248 Lorraine Avenue, Upper Montclair, N.J. Some files that were temporarily in Horowitz' office for use by him in connection with tax audits, as well as some records that Kasser had kept at his home, were also placed there. The lease ran to Joel Mallin, Kasser's New York lawyer, who has paid the rent but has been reimbursed by checks signed by Horowitz on one of Kasser's bank accounts. Mallin has never been in the Lorraine Avenue office. One of the two keys to the office is in the possession of Michael Kasser, who has never used it; the other is in the possession of Horowitz, who has. There are also two keys to the filing cabinets; Horowitz has one and the other has been left in the office. From time to time Horowitz has gone to the office, unlocked the filing cabinets, and made extensive use of the records in his work as accountant for the Kassers and the corporations.

Before learning of the existence of the Lorraine Avenue office, the Assistant United States Attorney in charge of the grand jury investigation of Kasser served on Horowitz, on July 26, 1972, a *subpoena duces tecum* requiring him to produce before the grand jury seven categories of records. After learning from Horowitz' testimony before the grand jury about the office and Kasser's scheme for concealing records there, a second *subpoena duces tecum* was served two days later, which was evidently intended to supplant the first. This required Horowitz to produce the entire contents of all three file cabinets in the Lorraine Avenue office. Pursuant to agreement between Horowitz and the Assistant United States Attorney, the three file cabinets were brought to the latter's office, where they were to remain unopened pending the outcome of the contemplated motion to quash. After completing an inventory of their con-

tents, Horowitz moved to quash the subpoena in October, 1972. For reasons not stated, no action was taken with respect to this motion for nearly six months. Meanwhile, in March, 1973, Kasser and his wife, through their attorneys, also moved to quash, on the three bases of overbreadth of the subpoena, violation of the attorney-client privilege with respect to letters between Kasser and his lawyers, and, if the motion is read charitably, violation of the Kassers' privilege against self-incrimination.

The motions to quash were brought on for hearing on March 28, 1973. Testimony was taken on that day and again on April 9. At the end of the latter hearing Judge Pollack delivered an oral opinion declining to quash the subpoena except with respect to four items specified in his order of April 12, 1973.[2] He stayed execution of the subpoena until April 19; a panel of this court extended the stay pending an expedited hearing on May 1, and we extended it until determination of the appeal.

## I. *Overbreadth*

The notion that a *subpoena duces tecum* may constitute a search forbidden by the Fourth Amendment owes its birth to the famous case of Boyd v. United States, 116 U.S. 616, 621–622, 630, 6 S. Ct. 524, 29 L.Ed. 746 (1886), where Mr. Justice Bradley reached this result enroute to holding that the court-ordered production of a person's "private papers" violated the Fourth as well as the Fifth Amendment.[3] The Fourth Amendment portion of the *Boyd* decision was surely not based on the overbreadth of the Government's demand; the Government sought only a single invoice of unquestionable relevance.[4]

Twenty years later the Supreme Court had occasion to reconsider this portion of the *Boyd* holding in the almost equally famous case of Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). See also ICC v. Baird, 194 U.S. 25, 44–47, 24 S.Ct. 563, 48 L.Ed. 860 (1904). By the time Hale v. Henkel was decided, the composition of the Court had almost entirely changed; of the *Boyd* court only Mr. Justice Harlan remained. Mr. Justice Brown wrote the majority opinion, representing the views of five Justices. They thought "it quite clear that the search and seizure clause of the 4th Amendment was not intended to interfere with the power of courts to compel, through a *subpoena duces tecum*, the production upon a trial in court, of documentary evidence." 201 U.S. at 73, 26 S.Ct. at 378. On the other hand, such a subpoena might constitute a forbidden search if its terms were "unreasonable", and the majority, regarding the *subpoena duces tecum* at issue requiring the production of books and records of the MacAndrews & Forbes Company, which was being investigated under the Sherman Act, held that it was "far too sweeping in its terms," 201 U. S. at 76, 26 S.Ct. at 380. The majority asserted, in what seems to have been a

2. These are:
   a. The personal wills of Alexander and Elizabeth Kasser;
   b. Trust agreements of Alexander and Elizabeth Kasser;
   c. Patents owned by Alexander and Elizabeth Kasser; and
   d. Letters of Alexander or Elizabeth Kasser which are strictly personal.
   The order also provided that if a dispute should arise as to whether any documents fell within these exceptions, they should immediately be submitted to the Court for *in camera* inspection and that documents turned over pursuant to the order should not be disclosed to Canadian criminal authorities except pursuant to motion on notice.

3. Mr. Justice Miller and Chief Justice Waite dissented from this portion of Mr. Justice Bradley's opinion, 116 U.S. at 638–641, 6 S.Ct. 524, 29 L.Ed.2d 746.

4. The notice to produce involved in *Boyd* was indeed unusual in that the statute under which it was issued declared that if the defendant failed to produce the record, the allegations which the motion of the United States Attorney stated he expected to prove from it "shall be taken as confessed." 116 U.S. at 620, 6 S.Ct. 524. But this goes to justifying the holding under the Fifth Amendment rather than that under the Fourth.

bit of hyperbole, that "If the writ had required the production of all the books, papers and documents found in the office of the MacAndrews & Forbes Company, it would scarcely be more universal in its operation or more completely put a stop to the business of that company" and that it was "difficult to say how [the corporation's] business could be carried on after it had been denuded of this mass of material . . . ." 201 U.S. at 77, 26 S.Ct. at 380. While ultimately production of many of the documents might be properly required, "some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers." *Id.* On the other hand, since Hale, an officer of MacAndrews & Forbes, was not justified in refusing to answer oral questions propounded to him, the order remanding him for contempt was affirmed.

Three other opinions were written. Mr. Justice Harlan concurring, although agreeing, in more moderate terms, "that the subpoena duces tecum was too broad and indefinite," 201 U.S. at 78, 26 S.Ct. at 380, thought that Hale had no standing to assert the company's rights and also that a corporation was not protected by the Fourth Amendment. Mr. Justice McKenna, also concurring, echoing the point made by Mr. Justice Miller in his dissent in *Boyd,* see note 3 *supra,* agreed that a properly limited subpoena was not within the Fourth Amendment but could not believe that a subpoena could "lose this essential distinction from a search warrant by the generality or specialty of its terms." 201 U.S. at 80, 26 S.Ct. at 381. Mr. Justice Brewer, joined by Chief Justice Fuller,. dissented; they challenged Mr. Justice Harlan's view concerning the inapplicability of the Fourth Amendment to corporations, referred to Mr. Justice Bradley's opinion in *Boyd,* and disagreed with the holding that, despite the invalidity of the sub-

poena, Hale was properly remanded. 201 U.S. at 83–89, 26 S.Ct. 370.

Hale v. Henkel left the applicability of the Fourth Amendment to *subpoenas duces tecum* in a most confusing state. None of the Justices seemed to think that such a subpoena could be issued only "upon probable cause, supported by oath or affirmation," as would be required for a search warrant. Nevertheless, except for Mr. Justice McKenna, all were of the view that an overbroad *subpoena duces tecum* against an individual would be an unreasonable search and seizure.

For the next twenty years Supreme Court decisions in this area were mainly concerned with what constituted overbreadth. In a number of cases the Court enforced *subpoenas duces tecum* which, while somewhat less broad than that in Hale v. Henkel, could scarcely be regarded as narrow. Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 553–554, 28 S.Ct. 178, 52 L.Ed. 327 (1908); Wilson v. United States, 221 U.S. 361, 375–376, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Wheeler v. United States, 226 U.S. 478, 489, 33 S.Ct. 158, 57 L.Ed. 309 (1913); and, perhaps most notable, Brown v. United States, 276 U.S. 134, 142–143, 48 S.Ct. 288, 72 L.Ed. 500 (1928). The movement toward undermining the practical importance of Hale v. Henkel was later furthered in a series of cases relating to administrative subpoenas. The most important is Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). That case involved *subpoenas duces tecum* issued by the Wage and Hour Administrator in an investigation of possible violations of the Fair Labor Standards Act, which called for production of all books, papers and documents showing hours worked and wages paid to employees over a five year period, and other documents, apparently necessary to establish the company's coverage under the Act, relating to distribution of newspapers, dissemination of news, sources of news, and sources of advertising outside the state of Oklahoma.

Picking up the point made by Mr. Justice Miller in *Boyd* and by Mr. Justice McKenna in Hale v. Henkel, Justice Rutledge raised doubts whether the Fourth Amendment was properly applicable to judicial enforcement of subpoenas at all. Thus, he stated, 327 U.S. at 195, 66 S. Ct. at 498:

> The short answer to the Fourth Amendment objections is that the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made . . . . No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections . . . .

Mr. Justice Rutledge further explained, 327 U.S. at 202, 66 S.Ct. at 502:

> The primary source of misconception concerning the Fourth Amendment's function lies perhaps in the identification of cases involving so-called "figurative" or "constructive" search with cases of actual search and seizure. Only in this analogical sense can any question related to search and seizure be thought to arise in situations which, like the present ones, involve only the validity of authorized judicial orders.

And this was followed by a statement, 327 U.S. at 208, 66 S.Ct. at 505 that "the Fourth [Amendment], *if applicable*, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described'." (Emphasis supplied)

On the other hand, *Oklahoma Press* made clear that there still were constitutional restrictions on the scope of *subpoenas duces tecum*, whether these derived from the Fourth Amendment or the due process clause. For administra-

tive subpoenas these were stated to be, 327 U.S. at 208–209, 66 S.Ct. at 505–506:

> 1) "The gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable."

> 2) "The requirement of 'probable cause, supported by oath or affirmation,' literally applicable in the case of a warrant is satisfied, in that of an order for production by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry."

> 3) "[T]he requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily . . . this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."

Any thought that *Oklahoma Press* was limited to subpoenas issued by administrative agencies, as distinguished from grand jury subpoenas, was dispelled by United States v. Morton Salt Co., 338 U.S. 632, 642–643, 70 S.Ct. 357, 94 L.Ed. 401 (1950), which, although involving administrative action and distinguishing subpoenas issued in the course of a trial, 338 U.S. at 641–642, 70 S.Ct. at 363–364, justified the agency's demand by an analogy to the grand jury "which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." Although the *Morton Salt* opinion approved a demand for reports only when "the demand is not too indefinite and the information sought is reasonably rel-

evant," 338 U.S. at 652, 70 S.Ct. at 369, the lack of any meaningful content in the latter requirement was made evident in CAB v. Hermann, 353 U.S. 322, 77 S. Ct. 804, 1 L.Ed.2d 852 (1957), a per curiam opinion reversing 237 F.2d 359 (9 Cir. 1956). The *subpoenas duces tecum* there issued by the Civil Aeronautics Board in an investigation of alleged violations of the Civil Aeronautics Act by a group of individuals and business entities operating as the Skycoach air travel system, were characterized by the Court of Appeals as calling for "practically all records, books and documents of or concerning the companies," 237 F.2d at 361;[5] the Court of Appeals had held that the relevance of each item must be established before its production could be ordered. The Supreme Court read the order of the district court as enforcing "the Board's right to call for documents relevant to the issues of the Board's complaint," 353 U.S. at 323, 77 S.Ct. at 805, without indicating how the district court could have determined relevancy without knowing more about the documents than the record disclosed, see 237 F.2d at 362. McPhaul v. United States, 364 U.S. 372, 382–383, 81 S.Ct. 138, 140, 5 L.Ed.2d 136 (1960), also recognized the impracticability in many cases of detailed advance determination of relevancy. In sustaining a *subpoena duces tecum* issued by the House Committee on Un-American Activities calling for production of "all records, correspondence and memoranda pertaining to the organization of, the affiliation with other organizations and all monies received or expended by the Civil Rights Congress" for purposes of an investigation into the organization's alleged connections with Communist activity, the Court said, 364 U.S. at 382, 81 S.Ct. at 144:

It is not reasonable to suppose that the Subcommittee knew precisely what books and records were kept by the Civil Rights Congress, and therefore the subpoena could only "specif[y] . . . with reasonable particularity, the subjects to which the documents . . . relate." . . . The call of the subpoena for "all records, correspondence and memoranda" of the Civil Rights Congress relating to the three specified subjects describes them "with all of the particularity the nature of the inquiry and the [Subcommittee's situation would permit," Oklahoma Press Pub. Co. v. Walling, supra, 327 U.S. at 210, note 48, [66 S.Ct. at page 506].

The traditional Fourth Amendment formulation was repeated in See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967), where Mr. Justice White said in dictum:

It is now well settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

The latest chapter in this history is furnished by the companion cases of United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), and United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). In the *Dionisio* case, relating to grand jury subpoenas to furnish voice exemplars, the Court held, 410 U.S. at 9, 93 S.Ct. at 769:

It is clear that a subpoena to appear before a grand jury is not a "seizure" in the Fourth Amendment sense, even

---

5. Examination of the subpoenas indicates that this characterization, while perhaps slightly exaggerated, comes closer to conveying the true picture than the Court's rather bland reference to "certain categories of documents of the respondent companies covering specified periods of time." 353 U.S. at 323, 77

S.Ct. at 805. It is plain that compliance with the subpoenas was exceedingly burdensome, though the district court limited this somewhat by permitting compliance over a two-week period, and the relevance of many of the items was not discernible from the subpoenas themselves.

though that summons may be inconvenient or burdensome.

In *Mara,* which dealt with a grand jury subpoena requiring the production of handwriting and printing exemplars, the Court reached the same result with respect to what amounted in practical effect to a *subpoena duces tecum.* These decisions, and the reasoning behind them, suggest that the Court may be moving toward the position, urged by Mr. Justice Miller in *Boyd* and Mr. Justice McKenna in Hale v. Henkel and strongly intimated in Oklahoma Press Publishing Co. v. Walling, that restriction on overbroad *subpoenas duces tecum* rests not on the Fourth Amendment but on the less rigid requirements of the due process clause.

■ However great the intellectual interest of this question, we are not required to decide it. Whatever the dubieties in the Court's opinions in this area over the past decades, some things are tolerably clear: The production of the single invoice required in the *Boyd* case would not now be invalidated on Fourth Amendment grounds. Indeed, that result was inherent in ICC v. Baird, *supra,* 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860, and in Hale v. Henkel itself, 201 U.S. at 72–73, 26 S.Ct. 370, 50 L.Ed. 652. And, although the Constitution undoubtedly protects against overly broad *subpoenas duces tecum* the subpoena issued in Hale v. Henkel would not likely be deemed too broad today in light of *Oklahoma Press, Morton Salt,* and CAB v. Hermann. See K.C. Davis, Administrative Law Treatise § 3.04, at 174–79 (1958).

■ With this background we proceed to review the *subpoena duces tecum* here at issue, in light of the Supreme Court's instructions, notably in Oklahoma Press Publishing Co. v. Walling, *supra,* 327 U.S. at 208–209, 66 S.Ct. 494, 90 L.Ed. 614, and such decisions of the courts of appeals as McMann v. SEC, 87 F.2d 377 (2 Cir.) (L. Hand, J.) cert. denied, 301 U.S. 684, 57 S.Ct. 785, 81 L. Ed. 1342 (1937), and Schwimmer v. United States, 232 F.2d 855 (8 Cir.),

cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956). Clearly the subpoena was not open to objection on the score of vagueness; Horowitz was told exactly what he must produce. Neither would compliance with the subpoena be unduly burdensome on or "put a stop to the business" of the Kassers, a consideration which, as indicated, was stressed in Hale v. Henkel, *supra,* 201 U.S. at 76–77, 26 S.Ct. 370; the subpoenaed records were not being used for any business purpose.

■ What is more troubling is the matter of relevance. The subpoena requires production of all documents contained in the files, without any attempt to define classes of potentially relevant documents or any limitations as to subject matter or time period. The failure to limit the subpoena by subject matter is not necessarily fatal. The grand jury is entitled to consider not only whether the Kassers violated federal criminal law by making the $220,000 transfer from Canequip's Montreal bank account to its New York account to an account in Switzerland in 1971 but whether they used the United States mails or facilities of interstate or foreign transportation or communication in other ways to consummate the alleged frauds. Moreover, any document relating to Kasser's finances, or any that sheds light on the complex corporate structure of Kasser's enterprises, which he allegedly used to conceal the misapplication of funds in The Pas project, may turn out to be relevant to the grand jury's inquiry, and this prospect is somewhat heightened by Kasser's zeal in attempting to put the documents where they would not be found. However, we are told that some of the subpoenaed documents date back to 1951, and it is difficult to see what relevance there could be in papers so long antedating the inception of The Pas project in 1966. Accordingly, we shall limit the subpoena so that in the case of any paper dated prior to January 1, 1966, the government must make a minimal showing that, in light of other evidence that has been obtained, the paper

may be relevant to the grand jury's investigation of a federal crime. With respect to papers dated on or after January 1, 1966, we will place the burden the other way. If the Kassers can satisfy Judge Pollack that a particular category of documents can have no conceivable relevance to any legitimate object of investigation by the federal grand jury, see Hall, Kamisar, LeFave and Israel, Modern Criminal Procedure 808 (3d ed. 1969), that category need not be produced. If the judge should find that overseeing compliance is too burdensome, he is free to utilize a magistrate or appoint a special master. All the papers shall remain impounded for such reasonable time as may be needed for completion of the grand jury's inquiry.

## II. *Attorney-Client Privilege*

Of the inventory of many hundreds of folders in the file cabinets, fifteen folders contain legends indicating that they may contain communications from or to lawyers.[6] As indicated in the footnote, we cannot now tell just which were communications with the Kassers, although numbers 2, 3, 5, 7, 8, 9, and 11 appear to be, as might number 10 if only we knew who or what "Trezona" was. We likewise do not know how far the contents of these files may be excluded by the rulings in Part I of this opinion. The Government contended, and the district court held, that whatever attorney-client privilege may have existed while such materials were in the Kassers' possession, this was lost when they caused the communications to be transferred to the Lorraine Avenue office in such a manner that Horowitz had unrestricted access to them.

The record concerning Horowitz' use of the files containing communications between the Kassers and lawyers is meagre. Horowitz first testified that "If the file was labeled 'Legal', I had no occasion to look at it," although there may have been times when Kasser showed him a letter from a lawyer. Later, he conceded that he "may have thumbed through them" or "glanced at them", and may have "seen what they said." He claimed, however, that he would read the legal files "[o]nly if there was some specific reason for me to search for something or Kasser had told me that there was a legal opinion on it, and that was rare," since usually he would communicate directly with the attorneys when a legal problem arose.

We held in United States v. Kovel, 296 F.2d 918 (2 Cir. 1961), that, despite the contrary indication in clause (7) of Wigmore's formulation of the attorney-client privilege,[7] it was not fatal

6. The first folder is labeled:
   Siace Celanese Participations—Roberts & Holland—Attorneys letters.
   Roberts & Holland is a well-known firm of tax attorneys. The others are labeled as follows:
   2. Kasser—Roberts & Holland
   3. Kasser—Joel Mallin file
   4. Siace—Foreign Corps. containing letters from Roberts & Holland—Kasser tax information return forms—Celanese tax information return forms, and Celanese Correspondence and Siace data
   5. Kasser—Radio Hill letter from Roberts & Holland and papers re: Siace —Radio Hill
   6. Blue Construction agreement with Technopulp Machinery
      Letter from Roth Carlson, attorneys
      Letter to Chemical Bank
      Unrelated photostats
   7. Kasser Radio Hill—Celanese—Letters from attorneys and legal documents re: Sale & Redemption of shares
   8. Kasser letters from attorneys and other tax information 1099 forms relating to Kasser—Radio Hill
   9. Kasser—Commerce Dept. forms filed —correspondence with Commerce Dept. and letters from attorneys
   10. Legal correspondence from Trezona to Kasser
   11. Legal correspondence to Kasser
   12. RS legal correspondence
   13. Legal correspondence re: River Sawmills
   14. Legal opinion re: timber contracts
   15. Legal correspondence to Mochary from Thompson Dilts & Co.

7. See 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961), at 554:
   (1) Where legal advice of any kind is sought (2) from a professional legal

to the privilege that disclosure of confidential communications was sought from an accountant rather than from the client or his legal adviser.[8] It follows that the attorney-client privilege is not inapplicable here solely because the documents were in Horowitz' possession.

■ However, the problem in *Kovel* was different from that here presented. We held there that the privilege extended to communications to an accountant for subsequent use in obtaining advice from a lawyer. Here the advice had already been obtained from the lawyers and the communications were then made available by the client to the accountant for purposes unrelated to the seeking of legal advice. In that light such communications as Horowitz actually reviewed come under the contrary holding in Himmelfarb v. United States, 175 F.2d 924, 939 (9 Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); see United States v. Kovel, *supra,* 296 F.2d at 922 n. 3. We deem it clear that subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege. See McCormick, Evidence § 93, at 197 (Cleary ed. 1972), and cases there cited; 8 Wigmore, Evidence § 2311, at 599 (McNaughton rev. 1961); Simon, The Attorney-Client Privilege as Applied to Corporations, 65 Yale L.J. 953, 981 (1956); Edison Elec. Light Co. v. United States Elec. Lighting Co., 44 F. 294, 298 (C.C.S.D.N.Y.1890).

This leaves for decision the applicability of the attorney-client privilege to files possibly containing communications that were initially within that privilege, to which Horowitz had unrestricted access at the Lorraine Avenue office, but which he apparently never viewed. While there has been much discussion how far the privilege is destroyed by the presence of third persons at an oral communication, see 8 Wigmore, *supra,* § 2311; McCormick, *supra,* § 91, at 188–89, and as to disclosure by persons hearing the conversation,[9] there seems to be relatively little authority on the issue whether confidentiality is lost by placing written communications between lawyer and client in a place where they are available to others.

■ Certain basic principles, however, are well-established. The privilege finds its justification in the need to allow a client to place in his lawyer the "unrestricted and unbounded confidence", United States v. Kovel, *supra,* 296 F.2d at 921, that is viewed as essential to the protection of his legal rights. But the privilege stands in derogation of the public's "right to every man's evidence", 8 Wigmore, *supra,* § 2192, at 70, and as "an obstacle to the investigation of the truth," *id.,* § 2291, at 554; thus, as Wigmore has said, "It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* It must be emphasized that it is vital to a claim of privilege that the communications be-

adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8. The Proposed Federal Rules of Evidence likewise omit the limitation of Wigmore's clause (7). Rule 503(b) provides that a client has a privilege to prevent "any other person" from disclosing confidential communications, so long as these were "made for the purpose of facilitating the rendition of professional legal services."

9. Citing substantial authority, Wigmore thought disclosure by such a person to be permissible even when the person was an eavesdropper, § 2326. This rule was adopted in the ALI's Model Code of Evidence (1942); see Rule 210 & comment b. The Uniform Rules of Evidence, Rule 26, and now the Proposed Federal Rules of Evidence, see Rule 503 (b) & Advisory Committee's Note, take a contrary view with respect to the eavesdropper.

tween client and attorney were made in confidence and have been maintained in confidence. And, as with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements, United States v. Kovel, *supra*, 296 F.2d at 923.

In light of these principles, we think that Kasser has failed to discharge his burden. The comments of one district court, United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 465 (E.D. Mich.1954), are pertinent here:

> It is difficult to be persuaded that the documents were intended to remain confidential in the light of the fact that they were indiscriminately mingled with the other routine documents of the corporation and that no special effort to preserve them in segregated files with special protections was made. One measure of their continuing confidentiality is the degree of care exhibited in their keeping, and the risk of insufficient precautions must rest with the party claiming the privilege.[10]

*Cf.* 8 Wigmore, *supra*, §§ 2325–2326, at 633. It is not asking too much to insist that if a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality. If Kasser had

not wished to keep the communications between himself and his lawyers with him, he could have returned them to the lawyers. At the very least he could have directed Horowitz not to look at them. In contrast he treated the communications between himself and counsel on the same basis as all other records, with Horowitz, who was an independent contractor and not a servant, having a free run to look at what he pleased. It is apparent that Horowitz had the authority to look at any of the legal communications, many of which appear to deal with the tax and financial matters with which he was particularly concerned, if he thought that he might find something relevant to his preparation of Kasser's tax returns or other reports or his management of Kasser's finances during the latter's absence. Under the circumstances of this case, the confidentiality of communications between Kasser and his attorneys had come to an end.

### III. *Privilege Against Self-Incrimination*

■ The point most strenuously pressed by the Kassers is that ordering Horowitz to produce the documents, other than those constituting corporate records, would violate their privilege against self-incrimination.[11]

10. See also Advisory Committee's Note to Proposed Federal Rule 503(a)(4): "Taking or failing to take precautions may be considered as bearing on intent" to preserve confidentiality.

We need not and do not here decide the extent to which a corporation or other business organization wishing to retain its privilege with respect to communications with its counsel must keep these in segregated files. In the corporate context, the issue is complicated by the fact that a corporation can act only through its agents; the question largely turns on whether, for purposes of the privilege, lower-ranking employees should be regarded as the "client" or as third-parties from whom confidential communications must be kept. See Simon, *supra*, 65 Yale L.J. at 982–85. Even if the latter be the case, determination whether there has been a loss of confidentiality may depend on the facts

of each particular case. Lower-ranking employees may not as a practical matter have access to the files, or may lack authority to go through them; special precautions to preserve strict confidentiality may prove more burdensome than they would have been in this case.

11. Since the government has not chosen to argue that this bald claim by the Kassers' lawyers was not a sufficient showing that any of the documents, much less all of them, tended to incriminate, we need not consider whether the statement in Brown v. United States, 276 U.S. 134, 144, 48 S.Ct. 288, 290, 72 L. Ed. 500 (1928), that

> In any event it was Brown's duty to produce the papers in order that the court might by an inspection of them satisfy itself whether they contained matters which might tend to incriminate. If he declined to do so, that

Both sides contend that Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), where the Court rejected a taxpayer's claim that the compelled production of her tax records from her accountant violated her Fifth Amendment privilege, rules the issue in their favor. The Government finds in *Couch* a ringing affirmation that the privilege exists only when compulsion to produce testimony is exerted directly upon an accused. Appellants, on the other hand, stress the Court's remarks concerning constructive possession and privacy. They point to the Court's reliance in *Couch* on the facts that the tax records had been regularly given to the accountant for many years, and had remained in his continuous possession. In contrast, they argue, Horowitz never had permanent possession of any of the records, but rather used some of them first at Technopulp's offices and later at the Lorraine Avenue office; others were personal records, some taken from Kasser's home, which were unrelated to Horowitz' role as an accountant. Moreover, they emphasize that the Lorraine Avenue office was rented on behalf of Kasser for the express purpose of maintaining the privacy of the records; they suggest that an analogy to the person who keeps his records at home and allows an accountant to have access to them is appropriate here since Kasser, who had sold his home and did not have this option open, did what he viewed as the next best thing. While this case is indeed closer than *Couch,* we think the Government is right in arguing that *Couch* leads to affirmance.[12]

Mr. Justice Powell's opinion in *Couch* [13] is filled with references to the personal nature of the privilege. He thought it "important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information which may incriminate him." (Emphasis in original.) This was followed by a quotation of Mr. Justice Holmes' statement in Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913): "A party is privileged from producing the evidence but not from its

---

alone would constitute a failure to show reasonable ground for his refusal to comply with the requirements of the subpoena.

has been deprived of all vitality, as it certainly has been attenuated, by such decisions as Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), Emspak v. United States, 349 U.S. 190, 198 n. 18, 75 S.Ct. 687, 99 L.Ed. 997 (1955), and Malloy v. Hogan, 378 U.S. 1, 11–14, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). See also McCormick, Evidence § 139 (Cleary ed. 1972), and the discussion in United States v. Reynolds, 345 U.S. 1, 8–9, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The Fifth Circuit recently approved an approach quite similar to that set out in *Brown.* United States v. Roundtree, 420 F.2d 845, 852 (5 Cir. 1969) (Wisdom, J.).

12. It is well to observe that this appeal does *not* involve the issue, reserved in Warden v. Hayden, 387 U.S. 294, 302–303, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and raised in recent decisions of the courts of appeals, compare United States v. Bennett, 409 F.2d 888, 896–897 (2 Cir. 1969), cert. denied, Thomas v. United States, 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 149 (1971); and United States v. Blank, 459 F.2d 383 (6 Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 111, 34 L.Ed.2d 143 (1972); with Hill v. Philpott, 445 F.2d 144 (7 Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542 (1971); and VonderAhe v. Howland, 73–1 USTC ¶ 9333 (9 Cir., Mar. 26, 1973), how far a possessor of incriminating documents who would be protected by the Fifth Amendment from their compelled production is protected by the Fourth Amendment from an otherwise lawful search and seizure.

13. Mr. Justice Powell delivered the opinion of the Court on behalf of six Justices. Mr. Justice Brennan also joined the opinion, but "on the understanding that it does not establish a *per se* rule defeating a claim of Fifth Amendment privilege whenever the documents in question are not in the possession of the person claiming the privilege." 409 U.S. at 337, 93 S.Ct. at 620. Two Justices dissented.

production." [14]  After stating that "The Constitution explicitly prohibits compelling an accused to bear witness 'against himself'," the opinion stated that "it necessarily did not proscribe incriminating statements elicited from another." Justice Powell then stressed that "Compulsion upon the person asserting it is an important element of the privilege," and that "It is extortion of information from the accused himself that offends our sense of justice." 409 U.S. at 328, 93 S.Ct. at 616.

The opinion proceeded to point out that, in *Couch* as here, "In the case before us the ingredient of personal compulsion against an accused is lacking" since the summons and order "are directed against the accountant. He . . . is the only one compelled to do anything." "Inquisitorial pressure or coercion against a potentially accused person, compelling her, against her will, to utter self-condemning words or produce incriminating documents is absent." 409 U.S. at 329, 93 S.Ct. at 616. *Boyd v. United States, supra,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, was distinguished on the basis that there the production order was directed against the accused. Reference was made to *United States v. White,* 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944), where the Court said that the privilege "is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to *produce and authenticate* any personal documents or effects that might incriminate him." (Emphasis supplied) In contrast, in *Couch* "there was no enforced communication of any kind from any accused or potential accused." 409 U.S. at 330–331, 93 S.Ct. at 617.

This analysis flowed directly not only from the language of the self-incrimination clause, "No person . . . shall be compelled in any criminal case to be a witness against himself," but from its history, dating back to the sixteenth century,[15] and from most of the Court's pronouncements concerning its policy. In Brown v. Walker, 161 U.S. 591, 596–597, 16 S.Ct. 644, 646–647, 40 L.Ed. 819 (1896), the majority explained this as follows:

> [I]f an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, . . . made the system so odious as to give rise to a demand for its total abolition.

Mr. Justice Field, in dissent, said, in a statement that has been often quoted, 161 U.S. at 637, 16 S.Ct. at 655:

> The essential and inherent cruelty of compelling a man to expose his own guilt is obvious to every one, and needs no illustration.

These concepts are the basis of Mr. Justice Goldberg's references, in Murphy v. Waterfront Commission, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964), to "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt" and "our fear that self-incriminating statements will be elicited by inhumane treatment and abuses." Such considerations are of no avail to appellants. The Kassers, at some remote and unknown location in Europe, bear scant

14. We recognize that in *Johnson* the person claiming the privilege had transferred both ownership and possession of his books and records to his trustee in bankruptcy, who later produced them against him. But Mr. Justice Powell, who was well aware of this, see 409 U.S. at 331–332 n. 14, 93 S.Ct. 611, thought the quotation to be relevant in

a case where the individual claiming the privilege still retained ownership.

15. See L. W. Levy, Origins of the Fifth Amendment (1968), *passim.* Doubtless the most famous and influential piece of history was the trial of John Lilburne, at the instance of Cromwell, in 1649. See *id.,* ch. X.

resemblance to John Lilburne in the dock.

Appellants' reliance is on one of the seven considerations listed by Mr. Justice Goldberg in *Murphy*:

> our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life." United States v. Grunewald, 2 Cir., 233 F.2d 556, 581–582 (Frank, J., dissenting), rev'd 353 U.S. 391, [77 S.Ct. 963, 1 L.Ed.2d 931].

The relevance of Judge Frank's remark to the *Grunewald* decision was remote. Halperin, a bagman between persons under investigation for alleged tax frauds and their lawyers, on the one hand, and government employees ready to fix the investigations, on the other, had previously exercised his privilege before a grand jury; the question was whether he could be asked about this when he decided to forego the privilege and testify at trial. In reversing, Grunewald v. United States, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court made no reference to Judge Frank's "private enclave" phrase or, indeed, to his opinion. The majority's decision did not go on the basis that the reference at trial to Halperin's refusal to testify before the grand jury was an invasion of the privilege, compare 353 U.S. at 425–426, 77 S.Ct. 963 (concurring opinion of Justice Black, joined by Chief Justice Warren and Justices Brennan and Douglas), but on the ground that, since the inference that his testimony at trial was inconsistent with the exercise of the privilege before the grand jury was equivocal, the trial judge had abused his discretion in holding that the probative effect of the evidence outweighed its potentially prejudicial impact. See United States v. Sobell, 314 F.2d 314, 323–324, (2 Cir.), cert. denied, 374 U.S. 857, 83 S.Ct. 1906, 10 L. Ed.2d 1077 (1963). Again, in Murphy v. Waterfront Commission, *supra*, 378 U.S. 52, 84 S.Ct. 1594, the issue was not the existence of the privilege but the scope of the immunity needed to overcome it.

■ Despite the eloquence of Judge Frank's phrase, the notion is difficult to accept in the context of the Fifth Amendment. Certainly "the right to a private enclave" lies at the core of the Fourth Amendment's strictures against law enforcement officers. Adopting a rational pattern, this gives the individual almost complete protection against the search and seizure of records of innocent activity and permits the search and seizure of records believed to show the commission of crime only when a proper showing has been made. The self-incrimination clause of the Fifth Amendment admittedly affords no protection against compulsory process reaching into "a private enclave" to obtain non-incriminating evidence necessary to the proper determination of a judicial proceeding, see 8 Wigmore, Evidence § 2192, at 72; § 2286, at 528–31, however personal or confidential this may be. It seems a strange concept of a right to privacy that, although this does not protect the most sensitive communications against disclosure in court so long as they are innocent, it demands absolute immunity for incriminating testimony alone. Despite the repetition of Mr. Justice Goldberg's catalogue of reasons for the privilege in *Couch, supra*, 409 U.S. at 328, 93 S.Ct. 611, 34 L.Ed.2d 548, see also Miranda v. Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Tehan v. United States ex rel. Shott, 382 U.S. 406, 414 n. 12, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), no Supreme Court decision has upheld a Fifth Amendment claim predicated solely, or even primarily, on the basis of an invasion of privacy, although Mr. Justice Douglas urged this in his dissent in Schmerber v. California, 384 U.S. 757, 778–779, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966),[16] where the taking of the de-

16. While the precise basis for the rejection of the Fifth Amendment claim in *Schmerber* was that blood test evidence was not testimonial or communicative,

fendant's blood was surely a far greater offense to privacy than the subpoena of business records.[17] When government has been forbidden to violate a reasonable expectation of privacy, Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967) (concurring opinion of Harlan, J.), this has been in cases where its acts were held to have violated the Fourth Amendment,[18] not the Fifth. The essence of the self-incrimination clause remains what it has always been—the prohibition of the exercise of compulsion upon the person whose communications, oral or written, may tend to incriminate him, and thus avoiding "the cruel trilemma of self-accusation, perjury or contempt." Murphy v. Waterfront Comm'n, *supra*, 378 U.S. at 55, 84 S.Ct. at 1596.

It is true that Mr. Justice Powell in *Couch* acknowledged that a different result *might* be reached in cases where the loss of possession by the claimant of the privilege was "fleeting," as instanced by the hypothetical posed in the oral argument in which possession was lost only while being helped across a street, see 409 U.S. at 333 n. 15, 93 S.Ct. 611, or where the "constructive possession" of the claimant was "so clear . . . as to leave the personal compulsions upon

the accused substantially intact." 409 U.S. at 333, 93 S.Ct. at 618. A sufficient reason for a different result in the hypothetical, a situation more likely to be encountered in law school classrooms than in real life, is that any other conclusion would trivialize the privilege. As for the "constructive possession" situation, Mr. Justice Powell neither defined the term in a Fifth Amendment context nor decided what the result would be when the definition was met. Given his insistence on the personal nature of the privilege, it seems highly unlikely that he was viewing the term as broadly as courts have done in other contexts, e. g., in applying the inference of knowledge of foreign importation formerly arising from possession of heroin under 21 U.S.C. § 174, see United States v. Hernandez, 290 F.2d 86, 90 (2 Cir. 1961). That the majority meant what it said in stating that it was merely leaving the question open appears from its refusal, 409 U.S. at 333–334 n. 16, 93 S.Ct. 611, either to approve or disapprove a constructive possession claim on the facts of Schwimmer v. United States, *supra*, 232 F.2d 855,[19] or the decision of this court in United States v. Guterma, 272 F.2d 344 (2 Cir. 1959), where the facts were much

384 U.S. at 763–764, 86 S.Ct. 1826, the majority opinion did state, 384 U.S. at 762, 86 S.Ct. at 1831, that

"Compelled submission [to a blood test] fails on one view to respect the 'inviolability of the human personality,'"

but went on to observe that

"The privilege has never been given the full scope which the values it helps to protect suggest."

*Id.*

17. Although at argument appellants' counsel made repeated reference to "diaries," it seems clear that those here involved are merely business appointment calendars. Calling such papers "diaries" gives them no special sanctity.

18. Or some general right of privacy thought to be derivable from the penumbras of various amendments, as in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and its progeny.

19. The reference to *Schwimmer* must have been as a hypothetical since Schwimmer had raised no self-incrimination claim. See 232 F.2d at 859. When he later sought to add a Fifth Amendment claim, the court held that it had been waived. Schwimmer v. United States, 232 F.2d 866, 868 (8 Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed. 2d 52 (1956).

In *Schwimmer*, the appellant, an attorney, had retired from active practice, closed his office and moved out of the state. He had stored his files in the plant of the Dean Rubber Manufacturing Company. The subpoenas to produce the files were directed to the Company. Although the relationship of Schwimmer to the Company was not made clear by the court of appeals, the record indicates that the Company was simply the custodian of the records for storage purposes and had no knowledge of the contents of the files.

stronger for the claimants than here.[20] Mere recognition that the privilege *might* be held to apply in some cases where the claimant is not in possession cannot be taken, as appellants urge, to tell us whether and in what circumstances it will. As Mr. Justice Holmes said in Johnson v. United States, *supra*, 228 U.S. at 458, 33 S.Ct. 572, 57 L.Ed. 919, "Courts proceed step by step."

Even if a "constructive possession" sufficient to give rise to the Fifth Amendment privilege would sometimes be recognized, it would be hard to think of a poorer case for recognition than this one. The Kassers have not had actual possession of the records for two years, have never had actual possession of them in their present situs and, from all that appears, do not expect to have it in the near future. It is Horowitz who has both actual possession of the files and complete access to them, facts which, in this context, are inconsistent with the Kassers' claim of constructive possession.[21] It cannot be seriously contended here that the "personal compulsions upon the accused [are left] substantially intact." See United States v. White, 477 F.2d 757 (5 Cir. 1973).

The district court is directed promptly to amend its order with respect to the scope of the *subpoena duces tecum* as indicated in Part I of this opinion. As so modified, the order will stand affirmed. The stay will be extended for ten days from the filing of this opinion and if an application for a further stay is filed with the Supreme Court within that period, until the determination thereof. No costs.

---

20. Although the records of Guterma that were the object of the *subpoena duces tecum* were in a safe stored in the office of a corporation in which he was interested, and the subpoena was served upon the corporation, only Guterma and an indicted co-defendant knew the combination. This court held that under these circumstances, "it will still be Guterma who will have to deliver his own papers," 272 F.2d at 346, and placed its decision on that ground. Here the Kassers are not being required to do anything.

21. The Government suggests that the validity of a subpoena served upon one who has possession of or access to the books and papers of another, as against the constitutional claims of the owner, may turn on whether the person served has sufficient control over the papers to warrant issuance of the subpoena to him. The Court in *Couch* also intimated that this may be an important consideration, 409 U.S. at 334 n. 18, 93 S.Ct. 611, 34 L.Ed.2d 548. In this case, Horowitz' control over the records was complete; he was not only *an* appropriate addressee of the subpoena, but by far the *most* appropriate one.