**UNITED STATES of America**

v.

**Arnold ARONOFF and Jerome Castle, Defendants.**

No. 78 Cr. 713.

United States District Court, S. D. New York.

March 5, 1979.

Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, New York City, by Thomas H. Sear and Robert S. Litt, Asst. U. S. Attys., New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Jay Topkis, George P. Felleman, Richard Zuckerman, and Gregory J. Wallance, New York City, for defendant Aronoff.

Saxe, Bacon & Bolan, New York City, by Michael Rosen, New York City, for defendant Castle.

## MEMORANDUM DECISION

CANNELLA, District Judge:

Motion by the Government for a pretrial order limiting the defendant Arnold Aronoff's assertion of his attorney/client privilege is granted to the limited extent indicated herein.

By this motion,[1] the Government seeks, in effect, a pretrial evidentiary ruling that Erwin Ziegelman, and other members of his firm, are not barred by any claim of privilege from disclosing "the substance of any communications or any files relating to" a certain land transaction which is the basis of the instant indictment against Aronoff. Ziegelman, who was Aronoff's attorney in connection with that transaction, has refused to disclose this information without a court order or formal waiver by Aronoff of his attorney/client privilege. Since the Government has brought the motion without revealing to the Court precisely what questions Ziegelman refuses to answer, it apparently concedes, for now at least, that the matters in question involve communications of the sort that are ordinarily protected by the attorney/client privilege. *See generally* 8 Wigmore, *Evidence* §§ 2294–2320 (McNaughton rev. 1961). The Government's sole contention is that certain statements made by another of Aronoff's attorneys, after the attorney/client relationship between Aronoff and Ziegelman had terminated, effected a waiver of Aronoff's privilege concerning his communications to Ziegelman.

On November 21 and 22, 1978, the Court conducted an evidentiary hearing on this motion. It now makes the following findings of fact and conclusions of law. Fed.R. Crim.P. 12(e).

*Statements made in 1975 and 1976 in connection with an SEC investigation*

In 1973, Aronoff retained Ziegelman as his attorney in connection with a multimillion-dollar transaction involving a tract of land in Putnam County, Florida. One of the participants in that transaction was the Penn Dixie Corporation. During the course of negotiations and through the closing Ziegelman represented not only Aronoff, but also a trust located in the Cayman Islands ["the Cayman Islands Trust"], whose beneficiaries included Aronoff's minor children. In addition, Ziegelman participated in the transaction to some extent as a principal.[2]

In 1975, the Securities and Exchange Commission began an investigation of various dealings of the Penn Dixie Corporation,

---

1. The parties have agreed that the Government's request is "capable of determination without the trial of the general issue." Fed.R. Crim.P. 12(b).

2. The sole witness for Aronoff testified that Ziegelman or his firm hada seven-and-a-half percent interest in the transaction. Transcript of Proceedings at 148 (testimony of D. Levitt), *United States v. Aronoff*, No. 78 Cr. 713 (S.D. N.Y. Nov. 21, 1978).

one of which was the Putnam County land transaction. In November 1975, in connection with that investigation, Ziegelman testified and turned over some of the documents that had been subpoenaed by the SEC staff. He refused, however, to disclose the identity of his clients (Aronoff and the Cayman Islands Trust), and withheld the remainder of the subpoenaed documents, on the ground of attorney/client privilege. Moreover, from the documents he did turn over, he deleted any information that would have identified Aronoff or the trust.

Shortly thereafter, George Michaely, the attorney representing Ziegelman in connection with the SEC investigation, contacted Daniel Levitt, who was then Aronoff's attorney. Michaely informed Levitt about Ziegelman's testimony and document productions and asked whether Aronoff would waive his objections to further disclosures. From certain statements made by Levitt during subsequent discussions, Michaely eventually concluded that Aronoff and the trust had waived their objections, and he advised Ziegelman to turn over to the SEC the previously withheld information.

Subsequently, and throughout the course of the investigation, Levitt urged the SEC staff to discuss the land transaction with Ziegelman, who, according to Levitt, would have corroborated Aronoff's version of the events surrounding the Putnam County land deal. There is no evidence that the SEC staff accepted this invitation.

The Government now contends that Levitt's statements to Michaely and the SEC staff amount to a waiver by Aronoff of his attorney/client privilege regarding his discussions with Ziegelman about the land deal. The defendant disputes this contention, primarily on the ground that regardless of what Aronoff or his attorneys said at the time, Ziegelman never disclosed any privileged communications, and therefore nothing was waived. In substance, the Court agrees with the defendant, and finds that any waiver by Aronoff during the course of the investigation was narrowly limited and would not, by itself, permit the inquiry now sought by the Government.

The extent of a waiver effected by Levitt's statements to Michaely may be determined only by considering what it was that Ziegelman had refused to disclose, as well as Levitt's precise words. When Ziegelman testified in November 1975, he withheld his clients' identities and several documents under a claim of privilege. Transcript of Proceedings at 28–29, 47–48 (testimony of G. Michaely), *United States v. Aronoff*, No. 78 Cr. 713 (S.D.N.Y. Nov. 21, 1978) [hereinafter cited as "Tr."]. On January 20, 1976, immediately after Michaely asked Levitt whether Aronoff would waive his privilege, Levitt sent Michaely a transcript of Aronoff's own testimony before the SEC, along with a letter, reminding Ziegelman of "his professional obligations to Mr. Aronoff in the context of the SEC's request for information and documents." Government's Exhibit 1A. On January 28, Michaely released to the SEC certain previously withheld documents; he continued, however, to protect Aronoff's identity and to withhold other documents. Government's Exhibit 1B.

Around this time, during late January or early February 1976, Aronoff received from Ziegelman's law firm a draft of a statement for him to sign waiving his objections to Ziegelman's testifying and producing additional documents on behalf of the Cayman Islands Trust. Aronoff showed this draft to Levitt, whereupon Levitt advised him that he had no privilege with respect to the trust documents, except perhaps, as father of two of the trust beneficiaries, and that any privilege belonging to the trust could be asserted or waived only by the trustee. Tr. at 78–81 (testimony of D. Levitt). Accordingly, Aronoff sent the trustee a letter, drafted by Levitt, stating that as father of two beneficiaries he had no objections to the trust's waiving its privilege. Government's Exhibits 1D, 1E.

Sometime thereafter, Michaely telephoned Levitt to discuss Aronoff's position with respect to the information still withheld by Ziegelman. Statements made by Levitt during that conversation led Michaely to send additional documents to the SEC,

with a cover letter dated March 22, 1976, stating that: "all persons concerned who might have been in a position to assert the privilege have waived the privilege." Government's Exhibit 2.

Levitt's precise words to Michaely during the phone conversation, however, have not been established. Michaely testified:

My recollection is that in the course of one of the conversations with Mr. Levitt I was informed that the, as best as I can characterize it, persons who may be in a position to assert a privilege had waived the privilege.

Tr. at 40. On cross-examination, however, Michaely qualified his answer as follows:

I am not attempting . . . to attribute those precise words to Mr. Levitt. What I am saying here, what I intended to do in a very short way, to state [sic; should be "was to state"] that it is my understanding, and this was to my recollection based on the telephone conversation with Mr. Levitt, that anyone who was in a position to assert this privilege, because there were three people who might have been involved, had waived it.

Tr. at 51. Michaely then explained that the three people he meant were "Mr. Aronoff as the parent of minor beneficiaries of the trust, the trustee, and then Mr. Aronoff." Id.

Levitt testified that he never told Michaely that those in a position to waive the attorney/client privilege had waived it. Tr. at 76. The only statement Levitt could recall regarding Aronoff's lack of objection to disclosure of documents was his response to Michaely's inquiry as to whether Aronoff would object to Ziegelman's disclosure of the agreement creating the Cayman Islands Trust:

I believe my recollection is of what I said to him, I don't see how I could have any objection. It is not my document. In any event it is not a privileged document. It is a legal agreement. So that I said I didn't see any problem, and that was the end of that conversation.

Tr. at 75.

Neither Levitt nor Michaely could produce a written record of what was said during any of their conversations. During their testimony, both of them appeared to be candid and honest. Of course, both have some interest in the outcome of this dispute. Michaely advised Ziegelman to release the documents. Levitt, at the time in question, represented Aronoff, and in connection with civil actions arising out of the Putnam County land deal, continues to represent him. The Court therefore finds the credibility of these two witnesses to be about the same.

Some additional indication of what Levitt told Michaely may be gleaned from the specific documents Michaely enclosed with his March 22 letter to the SEC. None of these appear to contain any information subject to any privilege belonging to Aronoff, except perhaps, Aronoff's identity as Ziegelman's client.[3] Most of them were either written or received by parties unrelated to Aronoff.[4] See, e. g., In re Horowitz, 482 F.2d 72, 81 (2d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); Colton v. United States, 306 F.2d 633, 639 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). The rest contain messages from Ziegelman's

3. The Court does not suggest that Aronoff's identity was in fact privileged information. On this issue, see, e. g., Colton v. United States, 306 F.2d 633, 636–37 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963).

4. These are the documents numbered "3" through "7" on the list appended to Michaely's March 22 letter, Government's Exhibit 2, as well as the Deed of Settlement of the Cayman Islands Trust and an explanatory memorandum.

None of the documents actually enclosed with Michaely's March 22 letter were offered by either side during the hearing. They were, however, attached as an appendix to Defendant's Post-Hearing Memorandum (filed Dec. 5, 1978). In a footnote on page 4 of its Reply Memorandum (filed Dec. 8, 1978), the Government stated that it "believe[s] those documents are copies of the documents submitted by Michaely," and waived objections to their being considered by the Court.

firm to Aronoff which are not "legal advice," but merely relate information derived from sources other than communications from Aronoff.[5] *See, e. g., Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Hall,* 346 F.2d 875, 882 (2d Cir.), *cert. denied,* 382 U.S. 910, 86 S.Ct. 250, 15 L.Ed.2d 161 (1965).

Thus, whatever words Levitt used, the effect of his statement was to convince Michaely that Aronoff had waived any objections he might have had to disclosure of his identity, as well as any he had as father of trust beneficiaries, and that the trust had waived its objections. Without additional· evidence, no broader waiver should now be inferred. By permitting his lawyer to disclose his identity, a client does not waive his right to object to disclosure of confidential communications. Nor does he waive that right by failing to object to his lawyer's disclosure of unprivileged information. *See IBM v. Sperry Rand Corp.,* 44 F.R.D. 10, 13 (D.Del.1968). Finally, the Court perceives no reason to conclude that Aronoff's waiver of objections on behalf of his children effected a waiver of his own privilege.

Furthermore, the Court finds no waiver in Levitt's urging the SEC to interview Ziegelman. As noted above, Ziegelman acted partly as a principal in connection with the land deal. Levitt has testified consistently that he told the SEC staff that Ziegelman's version of the *facts* would corroborate Aronoff's, and that he never stated that Ziegelman could or would disclose the substance of confidential *communications.* Tr. at 105–107, 114, 118, 122–25, 148–49. ·The attorney/client privilege protects communications; information learned by the attorney from sources other than the client or the client's agents is not within the client's prerogative to keep secret. 8 Wigmore, *supra,* § 2317, at 619. Since the SEC never followed Levitt's suggestion to interview Ziegelman, there is no evidence, such as Ziegelman's actual disclosure of privileged information, to contradict Levitt's ex-

planation. Consequently, absent a clearer expression of an intention to waive Aronoff's attorney/client privilege, the Court finds no waiver in Levitt's statements to the SEC.

*Statements made at a meeting with the United States Attorney before the indictment was filed*

One of the Government's charges against Aronoff is that prior to arranging the Putnam County land deal with Penn Dixie, he entered into a secret agreement giving Herbert Kesselman a 20% interest in 7,000 acres of the tract. Kesselman is the father of Aronoff's codefendant Jerome Castle, who was President and Chairman of the Board of Penn Dixie. The indictment alleges, *inter alia,* that neither Aronoff nor Castle revealed to Penn Dixie the existence of the side agreement for the benefit of Castle's father.

On October 5, 1978, Levitt and two other attorneys for Aronoff met with the United States Attorney and three of his assistants in an effort to persuade them not to bring an indictment against Aronoff. Levitt suggested that the grand jury not be asked to vote the indictment until he could make a presentation to the Government of exculpatory evidence which, he felt, would take some time to gather. An Assistant United States Attorney present at the meeting testified that Levitt described certain facts he thought were exculpatory, and then said that before Aronoff consummated the land deal, he

> went to his attorneys, Mr. Siegelman [*sic*] and . . . probably also Mr. Resnick [a member of Ziegelman's firm], and asked them whether there was anything about this side deal that was wrong or had to be disclosed, and was told by both Mr. Siegelman [*sic*] and Mr. Resnick that there was nothing illegal about it, nothing that the law required to disclose.

5. These are the documents numbered "1" and "2" by Government's Exhibit 2, as well as what appears to be a postscript added to a "blind copy" of the document numbered "3".

Tr. at 11 (testimony of AUSA J. Rakoff).[6] Levitt's testimony as to what he said differs somewhat:

I said that we believe that if you let us make the presentation, we believe the facts would show there was a meeting between Mr. Aronoff and his lawyers at which several things were discussed, including the fact that the purchase price of the trust hadn't been disclosed; the fact that no one at Penn Dixie knew that there was a family trust that owned the 7000 acres; and three, that Mr. Castle did not know that the investment that his father had made earlier in the spring . . . [involved the Putnam County land].

Tr. at 141–42.

After Levitt spoke, the United States Attorney indicated that he would give Aronoff's attorneys more time on the condition that Aronoff execute an "across-the-board" waiver of his attorney/client privilege. Levitt and another of Aronoff's attorneys were prepared to do so; the third wanted time to consider. Eventually, Aronoff refused to make such a waiver, and the indictment was filed on October 10.

The Government now contends that Levitt's statements on October 5 effected a waiver of Aronoff's privilege with respect to all communications with Ziegelman and his law firm relating to all aspects of the Putnam County land transaction. The defendant responds that no waiver occurred because: (1) Levitt spoke "hypothetically"; (2) the Government requested a waiver and that request was turned down; and (3) disclosures made during pre-indictment negotiations should not be found to constitute a waiver.

■ The latter two contentions are easily dismissed. If the defendant's attorneys wished to avoid an inadvertent waiver during pre-indictment negotiations, they could have agreed in advance with the Government's attorneys that any disclosures would be "without prejudice." *See United States v. United Shoe Machinery*

*Corp.,* 89 F.Supp. 357, 359 (D.Mass.1950). And, by itself, the Government's request for an "across-the-board" waiver is irrelevant to the Court's determination of whether a waiver had already occurred.

■ The defendant's first contention is not much more convincing. However Levitt's statements are characterized, the Court concludes that he asserted, on behalf of Aronoff: (1) that Aronoff discussed with Ziegelman's firm the nondisclosure to Penn Dixie of the purchase price of the Putnam County land, the existence of the Cayman Islands Trust, and the existence of the Kesselman side agreement; and (2) that Ziegelman and Resnick told Aronoff that there was nothing about the side agreement that he had to disclose. That Levitt qualified the assertions as beliefs does not matter much, since this qualification would have been implied anyway. That he added a condition—the Government's granting time for a presentation—is likewise irrelevant, since this was a condition on the defense attorneys' ability to gather sufficient support for the assertions, not a condition on their being made. Levitt did not say, for example, "if you give us more time we will make various assertions"; nor did the words he actually used suggest as much. The more reasonable inference to be drawn from his words was that he was making assertions, and that given time, he could produce convincing evidence to support them.

■ Absent a waiver, the communications to which Levitt referred would be protected by the attorney/client privilege, since the privilege ordinarily protects a client from having to disclose even the subject matter of his confidential communications with his attorney, *see Lee National Corp. v. Deramus,* 313 F.Supp. 224, 226–27 (D.Del.1970), as well as his attorney's confidential legal advice, *see, e. g.,* 8 Wigmore, *supra,* § 2320; *cf. United States v. IBM,* 66 F.R.D. 206, 212 (S.D.N.Y.1974) ("only to the extent that [it] reveal[s] confidential infor-

---

**6.** The parties stipulated that the United States Attorney, if called as a witness, "would testify the same as [AUSA] Rakoff did concerning the events of October 5, 1978." Tr. at 154.

■ mation communicated by the client to the lawyer"). The question presented, therefore, is whether, and to what extent, Levitt's assertions, on behalf of Aronoff, constitute a waiver.[7]

■ A client's disclosure to a third party of a communication made during a confidential consultation with his attorney "eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *see In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 463–64 (S.D.N.Y.1973). More significantly, a disclosure of, or even merely an assertion about, the communication may effect a waiver of privilege not only as to that communication, but also as to other communications made during the same consultation and communications made at other times about the same subject. *See, e. g., Haymes v. Smith*, 73 F.R.D. 572, 576–77 (W.D.N.Y. 1976); *ITT v. United Telephone Corp.*, 60 F.R.D. 177, 185–86 (M.D.Fla.1973). This latter principle, referred to by Wigmore as "waiver by implication," is based on considerations of fairness:

> [W]hen [the client's] conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final.

8 Wigmore, *supra*, § 2327, at 636. *See also* McCormick on Evidence § 93, at 194 (2d ed. 1972).

■ Most of the cases that have found implied waivers involved assertions by a client that made his confidential communications a material issue in a judicial proceeding,[8] circumstances in which it would be patently unfair to uphold a claim of privilege. Where a privilege-holder has made assertions about privileged communications, but has attempted to bar other evidence of those communications, there is a serious danger that his assertions are false or misleading. Thus, where his assertions have been offered on a material issue in a judicial proceeding, his privilege should be revoked at least with respect to any communications whose disclosure might affect the factfinder's judgment as to that issue. But where, as here, the privilege-holder has made assertions about privileged communications not to a factfinder at trial, but to his adversary, before trial, and has not, by any affirmative act, placed these communications in issue, it is harder to justify revoking his privilege as to matters not disclosed. The principle of waiver by implication as a qualification on the attorney/client privilege "should not be applied without reference both to the objectives of the privilege and the qualification." *IBM v. Sperry Rand Corporation*, 44 F.R.D. 10, 13 (D.Del.1968); *accord, Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 156–57 (D.Del.1977); *Goldman, Sachs & Co. v. Blondis*, 412 F.Supp. 286, 288 (N.D.Ill.1976); *see Magida ex rel. Vulcan Detinning Co. v. Continental Can Co.*, 12 F.R.D. 74, 77 (S.D. N.Y.1951). *But see, e. g., Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1161–62 (D.S.C.1974). Of course, it is conceivable that assertions before trial may mislead an adversary and thereby impede the proper functioning of the judicial system. But where the party attacking the privilege has not been prejudiced, and where there are no other grounds for find-

---

**7.** The defendant does not dispute that an attorney has implied authority to make disclosures and waive the attorney/client privilege on behalf of his client. *See* 8 Wigmore, *supra*, § 2325.

**8.** *See, e.g., Hunt v. Blackburn*, 128 U.S. 464, 470–71, 9 S.Ct. 125, 32 L.Ed. 488 (1888); *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 201 (2d Cir.), *cert. denied*, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929); 8 Wigmore, *supra*, § 2327, at 635–37 n. 3 and the numerous cases cited therein.

ing a waiver, there is no reason to find a waiver by implication.[9]

 In this case, the Government has not alleged any prejudice resulting from Aronoff's assertions about privileged communications, which, it seems, failed even to serve their intended purpose. Consequently, their legal effect is to let a whisker out of the bag, but not the whole cat.

Accordingly, Ziegelman may not refuse to disclose to the Government: (1) whether or not members of his firm discussed with Aronoff questions concerning their failure to disclose various aspects of the Putnam County land transaction to Penn Dixie; and (2) the substance of any advice given by any member of Ziegelman's firm, to Aronoff on his duty to disclose the Kesselman side agreement. Of course, Ziegelman may not on the grounds of attorney/client privilege refuse to disclose information derived from sources other than confidential communications with a client currently asserting the privilege, information which, according to Levitt, constitutes "99.9 percent" of what Ziegelman knows about the Putnam County land deal. But unless the Government makes an additional showing that it has been prejudiced by Aronoff's assertions about privileged material, this Court will not deny, to any further extent, Aronoff's privilege.

SO ORDERED.

---

**9.** In *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash. 1975), Chief Judge Neill distilled three factors common to cases in which courts had found waiver implied by conduct other than disclosure:

(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. *Id.* at 581.