See also, 2nd Cir., 811 F.2d 136.

**Martha von BULOW, by her next friends Alexander AUERSPERG and Annie Laurie Auersperg Kneissl, Plaintiff,**

v.

**Claus von BULOW, Defendant.**

**No. 85 Civ. 5553 (JMW).**

United States District Court,
S.D. New York.

Feb. 12, 1987.

David Simon, Michael F. Armstrong, Frederic W. Parnon, Carol Quackenbos, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for plaintiff.

John S. Martin, Jr., Martin L. Perschetz, Beryl A. Howell, Jonathan Barzilay, Schulte, Roth & Zabel, New York City, for defendant.

## MEMORANDUM AND ORDER

WALKER, District Judge:

### INTRODUCTION

Plaintiff Martha von Bulow by her next friends, Alexander Auersperg and Annie Laurie Auersperg Kneissl, have moved to compel discovery of certain discussions between Defendant Claus von Bulow ("von Bulow") and his attorneys, including Alan Dershowitz ("Dershowitz"). Plaintiff claims that the attorney-client privilege has been waived with respect to these communications.

The communications sought by plaintiff relate to a highly-publicized criminal proceeding wherein defendant, accused in Rhode Island state court of twice attempting to murder his wife, was convicted, obtained a reversal on appeal, and was acquitted after a retrial. Plaintiff claims that a waiver of the attorney-client privilege oc-

curred when Dershowitz subsequently published, with defendant's encouragement and approval, a book that argued defendant's innocence and disclosed numerous confidential communications between von Bulow and Dershowitz. For the reasons set forth below, the Court finds a waiver of the attorney-client privilege. The Court accordingly orders defendant and his attorneys to comply with discovery as specified below.

## STATEMENT OF FACTS

In 1982, following a highly publicized jury trial in a Rhode Island state court, defendant was convicted on two counts of attempted murder of his wife Martha von Bulow, now in a permanent coma, by surreptitiously injecting her with various drugs. Von Bulow was sentenced to ten and twenty years imprisonment, respectively. Shortly after the trial and before sentencing, von Bulow retained Dershowitz to represent him on the appeal from his conviction. In 1984, the Rhode Island Supreme Court reversed the conviction and, following a retrial in 1985, von Bulow was acquitted. These criminal proceedings received continuous coverage in the nation's print, radio, and television media.

Shortly after von Bulow's acquittal in 1985, the next friends, who are the children of Martha von Bulow from a prior marriage, commenced this federal civil action on their mother's behalf, seeking monetary damages and equitable relief from von Bulow. Their suit alleges common law assault, negligence, fraud, and RICO violations, arising out of the same facts and circumstances that were the subject of the Rhode Island criminal litigation.

In May 1986, Random House published a book entitled *Reversal of Fortune—Inside the von Bulow Case* ("*Reversal of Fortune*"), authored by Dershowitz. The book, which the Court has read, is in no way confined to publicly-filed briefs, transcripts, exhibits, and other documents. As the title represents, the book takes the reader "inside the von Bulow case." Dershowitz presents *Reversal of Fortune* as a credible account of the information he obtained, as von Bulow's lawyer through his own careful investigation in preparation for von Bulow's criminal appeal, new trial motion, and retrial, as a result of which he "became nearly certain" of von Bulow's innocence (pp. xxiii, 65). *Reversal of Fortune* contains extensive accounts, not contained in any public transcript, brief, or court record, of Dershowitz's private discussions with his client von Bulow; with fellow counsel; and with potential witnesses. These discussions relate to such matters as the circumstances surrounding Dershowitz's retention as counsel, the planning and strategy of von Bulow's application for bail pending appeal; and the strategy, planning and implementation of the appeal brought before the Rhode Island Supreme Court. *Reversal of Fortune* also describes in great detail the assembling of newly-discovered evidence and a motion for a new trial, and contains a lengthy and detailed account of the strategic planning and conduct of the successful defense at von Bulow's second trial, including the troublesome and intensely debated issue of whether defendant should testify in his own defense. *Reversal of Fortune* contains a detailed account of the obtaining and use of affidavits from two witnesses, David Marriott ("Marriott") and Father Philip Magaldi ("Magaldi"). These affidavits were used to cast doubts on the prosecution's case as part of the new trial motion and Marriott's subsequent recantation.

The thrust of the book is that von Bulow's innocence was established in Dershowitz's mind as a result of the author's extensive efforts as defendant's counsel—efforts that are painstakingly recounted from Dershowitz's first conference with von Bulow to defendant's acquittal following his second trial.

On November 14, 1985, approximately six months prior to publication of *Reversal of Fortune*, Dershowitz wrote von Bulow as follows:

Dear Claus:

I really appreciate your confidence in me, in encouraging me to write an honest

book about the case without showing it to you before publication. I think this will enhance the credibility of my strong case for your total innocence. Especially in light of our attack on (William) Wright (whose book, *The von Bulow Affair*, put forth a case for defendant's guilt), it is especially important for this to be *my* book. As you will see when my book comes out, it whets the reader's appetite to read your book.

I look forward to joining you at the opera in the near future.

With every good wish,

Cordially,

Alan Dershowitz (emphasis in original; parenthesis added.)

The following day, von Bulow replied by letter: "I certainly agree that neither I nor any representative of mine should see a manuscript of your book prior to publication" and that "I am confident it will be an honest book." Von Bulow requested "a hundred copies of your book for friends in Europe."

In March 1986, plaintiff's counsel obtained a copy of a draft of the Dershowitz manuscript that was being circulated to publishers. Plaintiff's counsel notified defendant's attorney by telephone, followed closely by a letter dated March 13, 1986, that the manuscript was being circulated in the publishing industry; that publication by Random House was expected shortly; and that the proposed book contained numerous disclosures of otherwise privileged communications between defendant and his counsel that "under the canons of ethics ... could not be made without defendant's consent." Plaintiff's attorney further represented that his client would view a failure by defendant to object to the disclosures as a waiver of "any privilege with respect to the subject matter of such disclosures and any other related communications with any of his counsel." At the same time, plaintiff's counsel furnished defendant's counsel with a copy of the manuscript. Defendant's counsel replied by letter that in his opinion no waiver had occurred since only the client, not the attor-

ney, could waive the attorney-client privilege and that therefore he would not advise his client to take any action. Counsel replied further that he had read the manuscript and found nothing which could reasonably be construed as waiving von Bulow's attorney-client privilege.

In a subsequent letter to defendant's counsel, dated April 23, 1986, plaintiff's counsel set forth, in substance, plaintiff's position that by not taking action to prevent the publication of privileged material, defendant would be waiving the privilege. The letter concluded:

There is no doubt that Mr. von Bulow has it within his power, by communicating with either Mr. Dershowitz or Random House, to prevent publication of otherwise privileged material. Mr. Dershowitz certainly would not publish privileged material over his client's objection, since to do so would be legally and ethically improper. Similarly, Random House would not publish privileged material over Mr. von Bulow's objection, since to do so would expose Random House to civil liability. (Footnote omitted)

It is understandable that Mr. von Bulow does not want to interfere in any way with the publication of a book, such as Mr. Dershowitz's, that attempts to portray Mr. von Bulow in a sympathetic light. However, the law makes clear that by knowingly taking this course and letting Mr. Dershowitz disclose privileged material, Mr. von Bulow will forever waive any privilege protecting the subject areas of the disclosures and will expose himself, and his lawyers, to examination concerning these subjects.

As this correspondence was being exchanged, von Bulow, aware that plaintiffs were trying to stop the publication of the book, wrote Dershowitz from London on April 4, 1986, stating that he "would like to arrange reviews and/or publicity for it [the book] in the U.K."

In May 1986, when the book was released, Dershowitz included the following passage in the acknowledgments section:

Finally, a note of appreciation to the subject of this book, Claus von Bulow, who had enough faith to encourage me to write an honest book about his case without asking me to show it to him in advance of publication. As Claus wrote me: "I am confident it will be an honest book, and will paint me, as Cromwell urged his portrait painter, 'warts and all.'" Because he has not seen this book, none of its contents should be attributed to him. Claus's story will be told in his forthcoming book.

Following publication, in late May and early June 1986, Dershowitz and von Bulow together generated publicity for *Reversal of Fortune*. Dershowitz appeared on one radio program and a series of television talk shows and was joined by von Bulow on two of them. On one of these programs, *The Phil Donahue Show*, Dershowitz, in von Bulow's presence provided, an account of further conversations with his client, not expressly set forth in the book, to which his client did not object.[1]

In order to obviate the necessity during depositions for the Court to rule piecemeal on each question of attorney-client privilege and waiver based on the book, on July 16, 1986, counsel stipulated as to the subject matter appearing in *Reversal of Fortune* as to which defendant claimed a privilege and plaintiffs claimed a waiver.

The firm of Schulte, Roth and Zabel ("Schulte, Roth"), defendant's initial counsel in this litigation, prepared most of defendant's papers opposing the instant motion. In September 1986, Schulte, Roth withdrew as defendant's counsel, with defendant retaining the firm of Patterson, Belknap, Webb & Tyler ("Patterson, Belknap") to handle his case.

Members of Patterson, Belknap subsequently represented to this Court that defendant wished to narrow the number and breadth of discovery disputes related to the instant case. Consistent with this objective, in a September 18, 1986 letter, defendant's new counsel represented that "Mr. von Bulow does not intend to assert the attorney-client privilege as to conversations with Mr. Dershowitz and his other attorneys relating to the Marriott-Magaldi episode." Counsel also agreed to commence discovery in the absence of a ruling on this motion. The Court, believing that further concessions might be forthcoming and that a ruling might not be required, deferred its decision on the motion. However, in January 1987, after several months of apparently productive discovery, the attorneys in the instant case informed the Court that they had reached an impasse as to the breadth of discovery plaintiffs could undertake without infringing defendant's attorney-client privilege.

## DISCUSSION

A. *Waiver of von Bulow's Attorney-Client Privilege.*

■ "[T]he [attorney-client] privilege ordinarily protects a client from having to disclose even the subject matter of his confidential communications with his attorney ... as well as his attorney's confidential legal advice...." *United States v. Aronoff,* 466 F.Supp. 855, 861–62 (S.D.N.Y. 1979) (citations omitted). However, the privilege applies only to private communications between the attorney and client which are not subsequently disclosed to others. *United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.1958), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958).

\* \* \* \* \* \*

"To Claus' credit right from the beginning he said to me—although I was very excited about it [the defense theory that Martha von Bulow injected herself with the drugs that placed her in a coma], he said, 'Alan, this is not an insulin case. Please keep you eye on the ball. This is not an insulin case.'" (*Id.,* transcript p. 17).

---

1. "You know, once I said to Claus halfway through the case, I said, 'Claus, I'm finally convinced you're innocent.'"
 "He looked me straight in the eye and said, 'Then you're a fool. How do you know? I'm the only one who knows. You can have your views and your opinions, but you'll be a better lawyer if you keep your mind open about it.'" (*The Phil Donahue Show, supra,* transcript at P. 35 [Simon affid., Ex. G] ).

"The theoretical predicate underlying all recognized privileges is that secrecy and confidentiality are necessary to promote the relationship fostered by the privilege. Once the secrecy or confidentiality is destroyed by a voluntary disclosure to a third party, the rationale for granting the privilege in the first instance no longer applies." *In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 464 (S.D. N.Y.1973) (citations omitted). Accordingly, where a client has published an account of his previously confidential conversations with an attorney, courts have held that these clients have waived the protection of the attorney-client privilege. *See, e.g., Agnew v. State*, 51 Md.App. 614, 446 A.2d 425, 445 (1982) (client's publication of book that included previously confidential communications with attorney resulted in a waiver of the attorney-client privilege); *City of Los Angeles v. Superior Court*, 170 C.A.3d 744, 754, 216 Cal.Rptr. 311, 317 (1985) (discussion of conversation with attorney during newspaper interview resulted in waiver of attorney-client privilege).

■ However, whether an attorney's publication of previously confidential discussions with his client waives the attorney-client privilege poses a more difficult question. As a general rule, "an attorney can neither invoke the [attorney-client] privilege for his own benefit when his client desires to waive it nor waive the privilege without his client's consent to the waiver." *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 556 (2d Cir.1967); *accord Leucadia, Inc. v. Reliance Insurance Co.*, 101 F.R.D. 674, 680 (S.D.N.Y. 1983). On the other hand, case law has established that, in appropriate circumstances, an attorney may possess "implied authority to waive the privilege on behalf of his client." *Drimmer v. Appleton*, 628 F.Supp. 1249, 1251 (S.D.N.Y.1986); *accord United States v. Aronoff*, 466 F.Supp. 855, 862 n. 7 (S.D.N.Y.1979). An attorney's disclosure of communications with his client will constitute a waiver of the attorney-client privilege if the client has encouraged or acquiesced in the disclosure, while no waiver will occur if the attorney's disclosure was made in the face of opposition or ignorance on the part of his client. *Drimmer v. Appleton, supra*, 628 F.Supp. at 1251.

In the instant case, this Court has no hesitation in finding that defendant actively encouraged Dershowitz's publication of *Reversal of Fortune*. The attorney's November 14 letter clearly informed defendant of Dershowitz's plans to publish a book describing the circumstances surrounding defendant's Rhode Island trials. When Dershowitz told him that the book would contain "my strong case for your total innocence," defendant received fair notice that Dershowitz planned to make previously confidential communications public. Nonetheless, defendant decided not to review the manuscript in order "to enhance the credibility" of "the strong case."

Any remaining doubts as to whether von Bulow acquiesced in Dershowitz's publication of privileged conversations are dispelled by the March 1986 and April 1986 letters from plaintiff's counsel to defendant's counsel. These letters, accompanied by a copy of the manuscript, stated in the most explicit terms that plaintiff would regard defendant's failure to object to the forthcoming publication of privileged communications as a waiver of the attorney-client privilege. The April letter stated:

> [T]he law makes clear that by knowingly taking this course and letting Mr. Dershowitz disclose privileged material, Mr. von Bulow will forever waive any privilege protecting the subject areas of the disclosures and will expose himself, and his lawyers, to examination concerning these subjects.

Finally, after Random House had published *Reversal of Fortune* and the once confidential discussions contained in the manuscript were placed before the public, defendant, fully aware that the book made out a "strong case for [his] total innocence", endorsed and promoted the book in television appearances. Indeed, he even allowed a further confidence to be breach-

ed in his presence on *The Phil Donohue Show.*

 Based on the above facts, this Court finds that defendant was well aware of Dershowitz's plan to publish *Reversal of Fortune*, complete with previously confidential information and that defendant, motivated by a strong desire to put his "case" before the public, actively encouraged the disclosures of the confidential information contained in the book. Defendant, having been put on notice of the book's contents by his adversary, may take no comfort from his deliberate refusal to read the manuscript. Accordingly, the Court concludes that defendant has waived his attorney-client privilege with respect to the subject matter and conversations published in the book.

Federal law supports this Court's conclusion that von Bulow's encouragement of Dershowitz's decision to publish *Reversal of Fortune* constitutes a waiver of the attorney-client privilege. For example, in the recently decided *Drimmer v. Appleton*, 628 F.Supp. 1249 (S.D.N.Y.1986), this Court held that a client's passive silence in a courtroom while his attorney testified as to the content of previously confidential communications with the client constituted a waiver of the attorney-client privilege. *Id.* at 1252. The *Drimmer* holding applies with even greater force in the instant case, since von Bulow did not merely greet *Reversal of Fortune* with passive acceptance, but rather actively encouraged and promoted its dissemination.

The Court of Appeals for this circuit also has held that client conduct far more equivocal than defendant's actions in the instant case is sufficient to waive the attorney-client privilege. *In re Horowitz*, 482 F.2d 72 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) held that any attorney-client privilege protecting about 15 documents was waived when the client provided these documents to his accountant, together with several hundred nonprivileged documents. *Id.* at 80–82. *See also In re John Doe Corp.*, 675 F.2d 482, 488–89 (2d Cir.1982) (disclosure of previously confidential materials to independent accountant and third-party's attorney waived attorney-client privilege). Since in the instant case previously confidential information was not merely disclosed to a single agent of the client, but instead was thrown open to the general public, this Court must conclude that the *Horowitz* decision strongly supports a holding here that von Bulow has waived the attorney-client privilege.

Defendant presents the Court with several ultimately unpersuasive arguments in support of his position that the publication of *Reversal of Fortune* did not result in any waiver of his attorney-client privilege. First, defendant argues that the book does not contain any previously confidential information, and concludes that the publication of *Reversal of Fortune* thus should not bar his subsequent invocation of the attorney-client privilege.

 If the information disclosed in *Reversal of Fortune* had been restricted to the pleadings, courtroom proceedings, and other information disclosed to the public during von Bulow's two criminal trials and appeal in the Rhode Island state courts, publication of the book would not constitute a waiver of von Bulow's attorney-client privilege. *United States v. Schenectady Savings Bank*, 525 F.Supp. 647, 652–54 (N.D.N.Y.1981); *Diotima Shipping Corp. v. Chase, Leavitt & Co.*, 102 F.R.D. 532, 537 (D.Maine 1984) ("publicly available facts ... cannot be the basis for an assertion of waiver of the attorney-client privilege"). However, Dershowitz made no such attempt to limit his reporting efforts to information already disclosed to the public. Instead, the book's title promises a look "Inside the von Bulow Case."

After reading *Reversal of Fortune*, this Court cannot conclude that Dershowitz delivers anything less than the insider's diary he promises. In Chapter 7, Dershowitz describes his initial meeting with von Bulow at defendant's Manhattan apartment, complete with quotes from von Bulow. In Chapter 8, Dershowitz describes his discussions with defendant on his appellate strategy after von Bulow's initial conviction,

and again includes direct quotes from defendant. No more than a cursory review *Reversal of Fortune* is required to determine that the book indeed contains numerous privileged communications.

Defendant also argues that even if *Reversal of Fortune* contains some privileged communications, Dershowitz's publication of these communications does not constitute a waiver of von Bulow's attorney-client privilege. In particular, defendant relies heavily on the decisions in *Byrnes v. IDS Realty Trust*, 85 F.R.D. 679 (S.D.N.Y. 1980) and *United States v. Aronoff*, 466 F.Supp. 855 (S.D.N.Y.1979). The facts of *Byrnes* and *Aronoff* are distinguishable from those of the instant case. Neither decision is inconsistent with a holding that the publication of *Reversal of Fortune* waived defendant's attorney-client privilege.

*Byrnes* held that an attorney's disclosure of confidential information during a private Securities and Exchange Commission hearing did not waive the client's ability to assert the attorney-client during subsequent civil litigation. In finding the absence of a waiver, the *Byrnes* court explicitly noted that the only disclosure of the confidential information was made before the SEC in a "nonpublic proceeding." *Id.* at 685. Such a limited disclosure is far different, and more consistent with a claim of continued confidentiality, than the broad public dissemination which occurred with the publication of *Reversal of Fortune*.

In addition, the *Byrnes* court based its narrow holding that disclosure to the SEC did not prevent a subsequent invocation of the attorney-client privilege on the policy, in aid of agency enforcement, that "voluntary disclosures to agencies should be encouraged rather than requiring that agency requests or subpoenas be fought to the hilt." *Id.* at 688. No such special public interest exists here, where the publication of *Reversal of Fortune* primarily served the defendant's private reputational interests.

This Court's decision in *United States v. Aronoff, supra*, is of even less assistance to defendant. The information disclosed by the attorney in *Aronoff*, which included the name of his client and documents "written or received by parties unrelated" to the client, did not constitute confidential information protected by the attorney-client privilege, and thus the publication of this information did not waive the privilege. *Id.* at 859–60. As discussed above, the information disclosed in *Reversal of Fortune*, unlike the information disclosed in *Aronoff*, included previously confidential communications between defendant and Dershowitz.

█ In concluding that Dershowitz's publication of *Reversal of Fortune* results in a waiver of defendant's attorney-client privilege, this Court is guided by one of the most basic policies governing the regulation of civil discovery: the policy that "evidentiary privileges in litigation are not favored." *Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979). This is because they contravene a fundamental principle of our jurisprudence that "the public ... has a right to every man's evidence." *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). Since the attorney-client privilege "stands in derogation of the public's 'right to every man's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) (quoting 8 Wigmore, Evidence § 2291 (McNaughton rev. 1961). The general rule that courts should provide a narrow interpretation of the contours of the attorney-client privilege applies with particular force in the instant case, where an attorney and client seek to prevent inquiry on matters which, in furtherance of their own respective interests, they have disseminated widely and discussed with the general public.

This Court would be blind to the facts of life in modern litigation if it did not recognize that many major cases, particularly where reputational interests are at stake,

are litigated not only in the courtroom but also in the arena of public opinion. It would skew all logic and violate fundamental fairness to allow a party to use otherwise privileged subject matter as a sword in the latter forum while at the same time permitting him to raise a shield to protect the same subject matter from discovery by his adversary in the former.

## SCOPE OF THE WAIVER

### 1. Discovery of the Contents of Published Conversations.

■ Having determined that defendant has waived the attorney-client privilege, this Court must next determine the scope of waiver. The principle that disclosure of a portion of a privileged conversation entitles an adversary to discovery of the matters discussed in the remainder of the conversation is well established in this circuit. See, e.g., United States v. Tellier, 255 F.2d 440, 447 (2d Cir.1958); Teachers Insurance v. Shamrock Broadcasting Co., Inc., 521 F.Supp. 638, 641 (S.D.N.Y.1981) ("courts have ruled that when a party discloses part of an otherwise privileged communication, he must in fairness disclose the entire communication, or at least so much of it as will make the disclosure complete and not misleadingly one-sided"). This Court thus holds that defendant must allow plaintiff to obtain discovery of the entire contents of all conversations from which Dershowitz published extracts in Reversal of Fortune.[2]

### 2. Discovery of Subject Matter Related to Published Conversations.

Plaintiff argues that the defendant's waiver extends beyond the specific communications and meetings disclosed in Reversal of Fortune to the subject matters of those disclosures and thereby, to all communications, whether or not revealed in the book, as to such subject matters.

■ Plaintiff is correct that an adversary may inquire into the subject matter related to a specific disclosure which waives the attorney-client privilege. See, e.g., Drimmer v. Appleton, supra, 628 F.Supp. at 1252; United States v. Aronoff, supra, 466 F.Supp. at 862; Haymes v. Smith, 73 F.R.D. 572, 576–77 (W.D.N.Y. 1976). Plaintiff has set forth seventeen areas of inquiry as to which subject matter waiver is claimed. The Court does not agree in every instance with plaintiff's characterization of the scope of the subject matter waived and, in one instance, concludes that the book's disclosure is insufficiently related to the claimed subject matter to justify a waiver finding. In addition, certain of the subject matter areas are mooted by defendant's independent decision to waive the attorney-client privilege with respect to all aspects of the Marriott-Magaldi episode. Each subject matter area is addressed in an Appendix to this opinion.

### 3. Discovery From Various Defense Attorneys.

■ It is clear that an attorney who, with his client's express or implied consent, engages in conduct which results in the waiver of his client's privilege cannot subsequently claim the attorney-client privilege in response to an adverse party's questions. See, e.g., United States v. Tellier, 255 F.2d 441, 448 (2d Cir.1958); In re Penn Central Commercial Paper Litigation, 61 F.R.D. 453, 464 (S.D.N.Y.1973). Having published Reversal of Fortune, and thereby having effectuated his client's waiver of the attorney-client privilege, Dershowitz

**2.** This Court has identified 4 conversations between von Bulow and Dershowitz described at length in Reversal of Fortune. Defendant must answer all relevant questions relating to each of these conversations. These 4 conversations, as well as the specific pages in Reversal of Fortune which mention these conversations, are listed below:

(i) Dershowitz's initial meeting with von Bulow. Pp. 50–54.

(ii) Von Bulow's meeting with Dershowitz and other attorneys with respect to defendant's Rhode Island bail hearing. · Pp. 56–62.

(iii) Dershowitz's meeting with von Bulow where defendant's Rhode Island appellate strategy was discussed. Pp. 66–68.

(iv) Von Bulow's meeting with Dershowitz and other attorneys as to whether defendant whould testify on his own behalf at his second trial. Pp. 203–13.

must answer all questions related to the subject matters disclosed in his book as to which a waiver has been determined.[3]

Whether the publication of *Reversal of Fortune* also prevents defendant's other attorneys from claiming the attorney-client privilege in response to questions related to subject matter disclosed in the book raises an issue not previously considered in this circuit. In *Nye v. Sage Products, Inc.*, 98 F.R.D. 452 (N.D.Ill.1982), however, the Court held that "disclosure of privileged documents can waive the privilege as to the client's communications with other attorneys." *Id.* 453.

■■■ Once the client has waived the attorney-client privilege with respect to a subject matter discussed with one attorney, thereby authorizing its disclosure, it would be anomalous to hold that discussions of the same subject matter with another attorney are privileged. The subject matter's confidentiality, an essential element to the assertion of the privilege, is no longer at issue. Certainly, where the client has encouraged and promoted his attorney's public disclosure of previously confidential communications, the client should not be not able to object to his adversary's full examination of the subject matter that he has voluntarily placed before the public.

In this case, it would be manifestly unfair to prevent discovery from von Bulow's other attorneys as to subject matters not only that von Bulow authorized for public dissemination by Dershowitz, but also that were disseminated under a special aura of truthfulness precisely because von Bulow had discussed them with his attorney in confidence. Assume that, in order to rebut a claim of recent fabrication, a client's attorney, with the client's acquiesence, testi-

fies as to what the client told him on an earlier occasion. If the attorney were then to testify that the client told him X after the attorney insisted on hearing the truth, it seems certain that, in fairness, evidence of a statement by the client to another attorney that contradicted X would then be admissible. The result should not vary merely because the credibility issue has been raised, as here, in the forum of public opinion.

Accordingly, defendant's other attorneys with knowledge of the subject matters held to be waived herein may not assert the attorney-client privilege in response to questions concerning documentary and testimonial evidence relating to those subjects.

## CONCLUSION

This Court finds that the publication of *Reversal of Fortune* resulted in a waiver of defendant's attorney-client privilege. Accordingly, plaintiffs' motion to compel discovery is granted, as specified in this opinion and the accompanying Appendix.

SO ORDERED.

## APPENDIX

This appendix contains a list of 17 subject matter areas submitted in the form of questions by stipulation of the parties. Plaintiff's counsel seeks testimonial and documentary discovery from defendant and his counsel in each area on the ground that any privilege that might otherwise have been asserted was waived by the publication, with defendant's consent, of *Reversal of Fortune.*

As the Court has held *Reversal of Fortune* to have resulted in a waiver of the

---

**3.** Plaintiff's counsel urges this Court to decide that the publication of *Reversal of Fortune* has resulted in a waiver of Dershowitz's ability to claim the work product privilege. However, Dershowitz already has answered questions in several lengthy depositions without invoking the work product privilege. Dershowitz's counsel has not indicated that the author of *Reversal of Fortune* intends to invoke the work product privilege in response to future questions relevant to the instant litigation.

Accordingly, at the present time this Court need not decide whether publication of *Reversal of Fortune* resulted in a waiver of Dershowitz's work product privilege. Should Dershowitz subsequently invoke this privilege, the issue of his waiver of the privilege by publishing *Reversal of Fortune* may then become ripe for a decision by this Court.

attorney-client privilege with respect to questions concerning subject matters disclosed therein, this Court finds that defendant has specifically waived his attorney-client privilege with respect to subject matter areas covered by Questions 1–2, 3(a) and (b), 4–5, 7, 12–17 and directs defendant and his counsel to respond to these questions, related questions, and documentary discovery requests necessary to provide plaintiff with full discovery on the subject matter covered by the questions.

This Court holds that the publication of *Reversal of Fortune* has not resulted in a waiver of defendant's ability to invoke the attorney-client privilege with respect to Question 3(c). Further, this Court views the waiver questions presented by Questions 6 and 8–11 as mooted by a previous limited waiver of the attorney-client privilege accepted by defendant. The basis for these holdings is described below.[1]

*Question 1:* What did the defendant and Professor Dershowitz discuss between themselves, at their first meeting, on the subject of Dershowitz's engagement as defendant's attorney?

As discussed in the text of the opinion, publication in *Reversal of Fortune* at pp. 50–55 of conversations held during this initial meeting with defendant constituted a waiver of defendant's privilege claims with respect to this meeting.

*Question 2:* What discussions took place between defendant and his several attorneys in regard to his bail application?

*Reversal of Fortune's* description of the conversations between Dershowitz and von Bulow regarding defendant's bail application (pp. 56–62), including an extensive conversation with von Bulow regarding the proper attorney to handle this application, constitutes a waiver of the attorney-client privilege with respect to the above question.

*Question 3:* What discussions took place between defendant and his attorney in regard to (a) the various strategies available on appeal, (b) the potential

development of leads to new evidence, and (c) meetings and arrangements with potential new witnesses?

*Reversal of Fortune* describes a conversation between Dershowitz and defendant regarding various strategies available on appeal. Pp. 66–68. The development of new evidence is specifically referred to in discussions between Dershowitz and defendant regarding the Kuh notes. Pp. 67–72. The only confidential communications relating to new witnesses as to which a waiver has occurred, however, relate to two specific individuals, David Marriott and Father Philip Magaldi. In as much as a separate waiver by defendant, in a September 18, 1986 letter, has been made with respect to matters involving Marriott and Magaldi, part (c) may not be inquired into except as it pertains to Marriott and Magaldi.

Accordingly, this Court holds that the book has resulted in a waiver of defendant's privilege claims with respect to Question 3, parts (a) and (b) but not (c) except as to matters pertaining to Marriott and Magaldi.

*Question 4:* Did defendant ever question his attorney regarding the reason for accepting the prosecution's lab results at the first trial or about the weaknesses in the prosecution's case?

*Reversal of Fortune*, at p. 115, quotes von Bulow as follows: " 'Why,' Claus kept asking, 'did Fahringer [a defense attorney during defendant's first criminal trial] accept the prosecution's lab results "as written in stone"?' " Publication of this previously confidential passage constitutes a waiver of defendant's privilege as to questions concerning the defense counsel's acceptance of the prosecution's lab results at the first trial.

*Question 5:* Did defendant and his attorney ever discuss the scientific and other investigations that his attorney was undertaking?

**1.** All page cites appearing in this appendix are to *Reversal of Fortune*.

*Reversal of Fortune*, at p. xxiii, discusses investigative techniques that von Bulow suggested that he wished Dershowitz to undertake, such as the employment of a "first-rate investigative reporter to probe the evidence with no strings attached." These disclosures are sufficient to constitute a waiver of defendant's privilege with respect to the subject matter covered by this question.

*Question 6:* Did defendant and his attorney ever discuss the accusations that Marriott had made against defendant; if so, what did defendant say to his attorney about them?

In the September 18, 1986 letter from defendant's current counsel, referred to above, defendant waived the attorney-client privilege as to discussions on the use of Marriott and Magaldi as witnesses. This earlier waiver renders the above question relating to any waiver resulting from the publication of *Reversal of Fortune* moot.

*Question 7:* Did defendant ever discuss with his attorney the subject of drug use by members of his family; if so, what was said to his attorney about this?

*Reversal of Fortune*, at p. 190, states that "Claus [von Bulow] ... had told his lawyers from the very beginning ... that his stepson sometimes used marijuana and cocaine, and had provided some specifics." Publication of this previously confidential discussion is sufficient to waive defendant's privilege with respect to the above question.

*Question 8:* Did defendant's attorney learn anything from defendant about David Marriott or Father Philip Magaldi?

*Question 9:* Did defendant ever tell his attorney that Marriott "circumvented" the channel of communication by calling or seeing defendant directly?

*Question 10:* Did defendant ever tell his attorney that defendant himself was making payments of money to Marriott?

*Question 11:* Did defendant ever tell his attorney that Marriott was trying to extract more money from defendant by threatening to change his story?

As discussed with respect to Questions 3 and 6, defendant's September 18, 1986 privilege waiver concerning the Marriott-Magaldi episode renders questions 8–11 moot.

*Question 12:* What took place at the "summit conference" of "all the lawyers" with defendant, in regard to whether defendant would take the stand in his own defense? What did defendant say to his lawyers and what did they say to him?

The description in *Reversal of Fortune*, at pp. 211–213, concerning this "summit meeting" constitutes a waiver of defendant's attorney-client privilege as to the subject matter of whether defendant would take the stand in his own defense.

*Question 13:* Did defendant and his attorney ever discuss the story of defendant's life? What was the attorney's reaction to what was said?

*Reversal of Fortune*, at p. 207, states: "In preparation for his possible testimony, I had Claus relate to me the entire story of his life. Claus's story was entirely convincing, answered many of my persistent questions, and put everything into a coherent context." This statement is sufficient to constitute a waiver of defendant's attorney-client privilege with respect to subject matters covered by the above Questions.

*Question 14:* Did defendant ever tell his attorney that he could "dispute the damning testimony of Maria and Alexander"?

*Question 15:* Did defendant ever tell his attorney that he could "deny that he had placed insulin in the black bag or in the needle?"

At p. 207, *Reversal of Fortune*, in discussing whether von Bulow should testify at his second criminal trial, states: "He could, of course testify about what he had *not* done. He could dispute the damning testimony of Maria and Alexander and deny that he had placed insulin in the black bag or in the needle [with which the drugs that placed Martha von Bulow into a coma were allegedly injected]." This disclosure of conversations between von Bulow and

Dershowitz is sufficient to constitute a waiver of defendant's attorney-client privilege with respect to the subject matters covered by questions 14 and 15.

*Question 16:* Did defendant's attorneys every discuss with him the kind of questions that would be put to him if he were to take the stand?

*Question 17:* Did defendant ever give any indication to his attorneys of what his answers would be to those questions? Did his attorneys ever tell defendant that a jury might react adversely to those answers?

*Reversal of Fortune,* at pp. 211–213, describes the conference which led to von Bulow's decision not to testify in his second criminal trial. After von Bulow's legal team had concluded that von Bulow should not testify, the book notes at p. 213: "There were no dissents, except for a regret from Claus, who said he had no choice but to follow his lawyers' advice." This disclosure, together with the preceding discussion of the strategy conference, is sufficient to waive defendant's attorney-client privilege with respect to the subject matter covered by questions 16 and 17.